USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC # _____
DATE FILED: September 14, 2020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

– against –

DANIEL DIBIASE,

Defendant.

**OPINION AND ORDER**

12 Cr. 834 (ER)

RAMOS, D.J.:

Daniel DiBiase ("DiBiase") is currently serving a sentence of 144 months' imprisonment at the satellite camp of Federal Correctional Institution, Fort Dix ("FCI Fort Dix"), a low security federal prison in New Jersey, and is scheduled to be released on January 7, 2023. Before the Court is his motion for compassionate release or, alternatively, an order permitting him to serve the remainder of his sentence on home confinement, pursuant to 18 U.S.C. § 3582(c)(1)(A), based on the COVID-19 pandemic. Doc. 217. The Government opposes the motion. Doc. 229. For the reasons set forth below, DiBiase's motion is DENIED.

## I. BACKGROUND

### a. Prior Proceedings

According to his Presentence Report ("PSR"), DiBiase was a member of a violent home invasion crew (the "Crew"), made up of himself, his brother Paul DiBiase ("Paul"), and a third man named Jason Foskey ("Foskey"). For more than a year, the Crew would locate affluent, vulnerable homes in Westchester County, New York, and Fairfield County, Connecticut, and burglarize those homes, and thereafter launder the proceeds through a fence in Manhattan. (PSR ¶ 13).

From August 2011 until their capture on October 17, 2012, the Crew burglarized approximately 27 homes, including five that were occupied at the time of the robbery.  In each instance, the Crew first met in Dutchess County, where they lived, and DiBiase would then drive them to either a particular home selected by Paul, or a neighborhood from which Paul would select a vulnerable target home.  (PSR ¶ 15).  During those burglaries, Paul and Foskey entered the homes while DiBiase waited outside in the car.  Although the majority of the homes they went to were unoccupied, they also purposely targeted occupied homes in some instances, and in other instances, unexpectedly ran into occupants that they mistakenly thought were not home.  On at least five occasions, when they encountered individuals at home, Paul and Foskey sometimes pistol-whipped the occupants, tied them up, gagged and bound them.  (PSR ¶¶ 16–17).

For example, on May 24, 2012, the Crew went to a home in Ridgefield, Connecticut and encountered the homeowner.  Inside the home, Paul and Foskey held her at gunpoint, and tied her feet and hands while hitting her in the back and threatening to "blow [her] head off."  They also demanded her engagement ring and forced her to open a safe in the house.  Ultimately, the Crew stole approximately $300,000 worth of jewelry and other goods and fled in a car driven by DiBiase.  When the police arrived, the homeowner had marks on her wrists and ankles, and required oxygen.  (PSR ¶ 24).  The Crew committed a similar gunpoint robbery two months later, on July 24, 2012, in Greenwich, Connecticut.  This time, when the police arrived, they found the homeowner with bruises on her face.  (PSR ¶ 25).

At the end of each burglary, DiBiase drove the Crew back to Dutchess County, where they sorted the stolen goods.  (PSR ¶ 19).  The Crew routinely laundered the stolen goods through a fence in Manhattan.  Thereafter they split the proceeds, on which they lived during the

time period of their scheme. (PSR ¶ 20). It is estimated based on interviews with the homeowners that the Crew stole approximately $2.5 million worth of goods.

On October 17, 2012, the Crew were arrested while driving a truck on Interstate 287 in Westchester County. At the time, the law enforcement officers found a knapsack in the truck containing a loaded gun with ammunition, replica guns, masks, and burglar tools.[1] They later found another gun and BB guns at their homes. (PSR ¶¶ 27–29). Thereafter, all three members of the Crew were charged in the Southern District of New York. On February 24, 2014, DiBiase pleaded guilty to Counts One and Two of a Superseding Information, charging him with racketeering conspiracy in violation of 18 U.S.C. § 1962(d), and brandishing a firearm in furtherance of the racketeering conspiracy in violation of 18 U.S.C. 924(c).

DiBiase's sentencing took place on February 27, 2015. Prior to the proceeding, multiple victims had submitted impact statements to the Court describing their physical and emotional trauma. As one victim described:

> [After the home invasion], I felt as if I was walking in a dream state. It was so hard to distinguish what was real and what was not real. I lived in fear of the men coming back. I was unable to be touched without cringing away from my family and friends. I was unable to sleep more than a few hours a night throughout the following year. For months I would often wake up crying following the invasion. I was afraid of being alone for months following the invasion. I was unable to socialize with family or friends…I was brutalized for approximately 1 ½ hours. My world has been changed forever by these men.

Doc. 69 ("the Government's Sentencing Submission"), at 10. Furthermore, multiple victims testified to the trauma they and their family members suffered at DiBiase's sentencing:

---

[1] That loaded gun was stolen by Paul from Foskey's neighbor, a law enforcement officer, during a home burglary in July 2011. (PSR ¶ 14).

> I hold Daniel Dibiase accountable for the brutality forced upon me and the robbery of our personal belongings which occurred on the night of May 24th, 2012. I feel Daniel Dibiase was well aware of the intentions of Paul Dibiase and Jason Foskey. I believe Daniel Dibiase knew of what was going on in our house as he sat waiting in his car. The two men which were his accomplices spent close to one and a half hours in my house. Daniel Dibiase did nothing to stop the robbery, and Daniel Dibiase did nothing to stand in the way of the horrific violence which was forced upon me.

Doc. 76 ("Sentencing Tr."), at 5–6.

> Your Honor, Daniel Dibiase was part of a group of three that invaded our home. He sat in the car, but he was an accomplice to the crime. He brutalized my wife for an hour and a half, terrorized her with a gun, threatened her life repeatedly, vandalized our house, took very important family possessions from us. And it is my understanding that he started planning this crime with his brother while still in jail, going on the internet to find homes to invade. This is not just an innocent person driving a car.

*Id*. at 6–7.  Having considered these statements, the parties' sentencing submissions, and the presentence report, the Court imposed a total sentence of 180 months' imprisonment:  96 months for the racketeering conspiracy and 84 months for the use of a gun in furtherance thereof.  In doing so, the Court noted that a sentence in the middle of the effective guidelines range of 171 to 192 months was appropriate for various reasons.

First, the Court began by noting that the home invasions were "the stuff of horror films. It is every parent's nightmare.  It is difficult to imagine what the victims felt as guns were held to their head and rape or murder seemed imminent.  It is difficult to imagine how they are going to be able to continue to live their lives, live in those same homes and tell each other that it is all going to be okay." *Id*. at 22.  Indeed, the Court noted that "even this sentence does not seem sufficient." *Id*.

Then, the Court specifically stressed that the fact that DiBiase was the getaway driver entitled him to no leniency because he was in his fifties and had already been convicted of

several serious crimes involving the same type of conduct. *Id.* Finally, the Court also noted that it had already factored DiBiase's age, medical condition, and difficult childhood into his sentence, but that "there has to come a point, particularly after [he's] gone through the criminal justice system a number of times" when "enough is enough," and that he had fully earned every day that he would spend in prison. *Id.* at 22–23.

More than four years after his sentencing, on July 18, 2019, the Government requested that DiBiase be resentenced in light of the Supreme Court's decision in *United States v. Davis*, 139 S. Ct. 2319 (2019). Doc. 184. In particular, DiBiase's § 924(c) conviction for brandishing a firearm in furtherance of a crime of violence could no longer stand because the Supreme Court found in *Davis* that conspiracy to commit racketeering no longer qualified as a "crime of violence" under 18 U.S.C. § 924(c)(3)(B). Thereafter, DiBiase submitted a letter requesting that the Court resentence him to 96 months' imprisonment. Doc. 193.

On September 26, 2019, the Court resentenced DiBiase to 144 months' imprisonment after vacating his § 924(c) conviction.[2] Doc. 197 ("Resentencing Tr."). In doing so, the Court noted that it remembered "few sentencings as clearly as…Mr. DiBiase's and his brother's

---

[2] As in DiBiase's initial sentencing, two victims testified to their lingering trauma from the home invasions at his resentencing and pleaded the Court to resentence him to his original 180 months' imprisonment. In particular, a victim stated:

> Over the last seven years I'm frequently awoken by the soft voice and gentle touch of my husband who assures me that I'm ok, I've had another nightmare. I see unexplained shadows. I survived a home invasion and its effects have greatly impacted and changed my life. Each day, your Honor, I live in fear of retaliation. Daniel DiBiase and his accomplices robbed me of my personal comfort, safety and well-being.

> I have moved far away from that beloved home. I had to move because knowing Daniel DiBiase and his accomplices monitored my house and me while I was inside and because of the magnitude of horrors which took place that night, my home which had been filled with loving memories became a house of unspeakable memories. I live in fear of Daniel DiBiase and his accomplices and how they have the capacity to hurt and, yes, even kill me.

*See* Doc. 197, at 7.

5

sentencings.  I remember the victims that testified at that time.  I remember very well their stories, their horrific stories and the horror that they experienced at the hands of Mr. DiBiase and his co-conspirators." *Id*. at 20.  The Court further found that, even considering the fact that DiBiase had been "a model prisoner for all intents and purposes" and that he acquired substantial additional medical conditions during his time in prison, "his crimes were so horrific that I believe it would be inappropriate to sentence him solely to the 96 months" that were previously imposed on his conviction for racketeering conspiracy.  *Id*. at 21.

### b.  The Instant Application

On March 11, 2020, the World Health Organization declared COVID-19 a global pandemic.  On March 26, 2020, the Attorney General William Barr issued a memorandum in which he directed the Bureau of Prisons (the "BOP) to prioritize the use of home confinement as a tool for combatting the dangers that COVID-19 poses to vulnerable inmates, while ensuring its obligation to protect the public.  In a subsequent memorandum dated April 3, 2020, the Attorney General reiterated his earlier guidance and further directed the BOP to give priority to the "most vulnerable inmates" at the "most affected facilities."  *See United States v. David*, No. 12 Cr. 214 (ER) (S.D.N.Y. Aug. 6, 2020) (Doc. 519, at 3).

On April 11, 2020, DiBiase petitioned the Warden of FCI Fort Dix for compassionate release.  Doc. 219, Ex. B.  Having heard no response, DiBiase's counsel sent a follow up letter on June 9, 2020 seeking an update of DiBiase's petition.[3]  Doc. 219, Ex. C.  On July 24, 2020, DiBiase filed the instant motion.

---

[3] The record does not indicate if, and what, the Warden of FCI Fort Dix has responded.  In any event, since well over 30 days have lapsed since DiBiase's petition, he has exhausted his administrative remedies, which the Government does not contest.

DiBiase claims that the threat of COVID-19 in prison settings,[4] combined with his age and medical condition, constitute extraordinary and compelling reasons for his compassionate release. Doc. 218, at 9–10. As indicated by his BOP medical records, DiBiase, who is 63 years old, suffers from type 2 diabetes, emphysema, hypertension, and has a body mass index over 30. *See* Doc. 219, Ex. A. DiBiase contends that the § 3553(a) factors also weigh in favor of his release. *See* Doc. 218, at 10–12. Specifically, DiBiase contends that he is not a danger to the community if released because, while his "crimes are certainly serious," he never personally entered any of the homes or threaten the occupants. *Id.* DiBiase further contends that his disciplinary infractions while incarcerated—for being in an authorized area, insolence, and circumventing phone privileges— are non-violent offenses that "do not raise concerns about recidivism." *Id.*

On August 31, 2020, the Court received the Government's opposition. Doc. 229. Once again, three victimized families have asked the Government to include their accounts of the pain suffered in its submission to the Court. In particular, one victim explained:

> I am a victim of a heinous crime. In May of 2012, two men broke into my home while I was inside. Brandishing their guns, they dragged me from the ground floor up to the second story of my house, aggressively pushing their guns into my stomach, my side, my neck and my head. The men choked me and repeatedly punched me. They restrained me by throwing me onto the ground, digging a knee into my back and pulling my arms up behind my back. Then, they pushed my face into the floor making it difficult for me to breathe. The two men yelled at me, threaten[ed] to blow my f'ing brains out and, they threatened to kill me. I was sexually victimized. The two men pulled my hair and their final act of brutality was to hogtie me. They ransacked my home. After filling their duffle bags with my belongings, they left. Daniel DiBiase's partners left me lying face down on the floor, beaten and bloodied, frightened and in shock with my legs bound by a telephone cord tied so tightly to my wrists I

---

[4] As of the date of this Order, FCI Fort Dix has no active case of COVID-19, or any death attributed thereto. Reportedly, 36 inmates and 6 staff members there have recovered from the virus. *See* https://www.bop.gov/coronavirus/. (last accessed September 14, 2020).

> couldn't move. While I was being beaten, threatened, terrorized, hogtied and victimized, Daniel DiBiase sat outside my home in the get-a-way car for one- and one-half hours. I ask you, did Daniel DiBiase exhibit compassion? He did not. It is clear to those familiar with this case that the evening I write about was not an isolated event. For years, Daniel DiBiase partnered in numerous robberies and home invasions. Daniel DiBiase participated in monstrous crimes and is a threat.

*Id*. at 10–11. While the Government acknowledges that DiBiase's medical conditions present an extraordinary and compelling reason for his release, it contends that the § 3553(a) factors nevertheless overwhelmingly support denying the instant motion. *Id*. at 8–12. Specifically, the Government contends that DiBiase's role as the getaway driver entitles him to no leniency because he participated in every home invasion as a critical participant by helping with planning, and driving his co-conspirators away before law enforcement could arrive at the scene. Moreover, the Government contends that denying the instant motion would serve the need to provide just punishment by letting the victims know their rights are protected, and general deterrence by letting potential perpetrators of violent crimes know that they cannot escape the terms of their incarceration. *Id*. Finally, the Government contends that DiBiase's generalized statements about conditions at FCI Fort Dix cannot support release, especially given that the facility is regularly testing individuals that are symptomatic and providing masks to all inmates. *Id*. at 12–13.

On September 2, 2020, the Court received DiBiase's reply letter. Doc. 230. In addition to arguing that the Government has not provided context for the anonymized victim statements, or explained how he would be a danger to the public if released, DiBiase argues that his "diminished culpability" is a mitigating factor and urges the Court to consider the danger he is in when evaluating whether the time he has already served in FCI Fort Dix has satisfied its retributive and deterrence purposes. *See generally id*.

## II.   LEGAL STANDARD

### a.   18 U.S.C. § 3582

Although a court may not normally "modify a term of imprisonment once it has been imposed," there are certain limited exceptions, including "compassionate release." *See United States v. Roberts*, No. 18 Crim. 528 (JMF), 2020 WL 1700032, at *1 (S.D.N.Y. Apr. 8, 2020) (internal quotation marks and citation omitted). A court may reduce a prisoner's sentence when it finds that there are "extraordinary and compelling reasons" that warrant such a reduction, but one of two conditions must first occur: either the BOP Director may move the court to release the prisoner; or, alternatively, the prisoner himself may move the court, but only after he has "fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A).

Once a petition for compassionate release is properly brought before a court, its discretion is guided by the policy statement in U.S. Sentencing Guidelines § 1B1.13. *See id*. The Guidelines place three conditions on a determination of early release:

> (1) There are extraordinary and compelling reasons that warrant the reduction; and
>
> (2) a situation where "the defendant is not a danger to the safety of any other person or to the community."
>
> (3) the reduction is consistent with this policy statement.

U.S. Sentencing Guidelines § 1B1.13. The Guidelines include as an "extraordinary and compelling reason" the existence of "a serious physical or medical condition…that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." *Id*. cmt. 1(A)(ii)(I).

9

The Guidelines further include as an "extraordinary and compelling reason" if the defendant is at least 65 years old, has served at least 10 years or 75 percent of his sentence, and "is experiencing a serious deterioration in physical or mental health because of the aging process." *Id*. cmt. 1(B).

When determining whether a prisoner is a danger to the community, section 1B1.13 refers to 18 U.S.C. § 3142(g), which in turn lists the following factors to be considered:

> (1) The nature and circumstances of the offense charged…;
>
> (2) The weight of the evidence against the person;
>
> (3) The history and characteristics of the person…; and
>
> (4) The nature and seriousness of the danger to any person or the community that would be posed by the person's release.

If the sentencing court finds that "extraordinary and compelling reasons" exist, it "may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable." 18 U.S.C. § 3582(c)(1)(A).

### III. DISCUSSION

#### A. The Nature of Relief Allowed by § 3582(c)

Citing to a single case, *United States v. McCalla*, No. 11 Cr. 452 (FLW), 2020 WL 3604120 (D.N.J. July 2, 2020), DiBiase argues that this Court "has the option of ordering him to serve the remainder of his sentence on home confinement, addressing any concerns about insufficient deterrence or any danger to the public." *See* Doc. 218 at 12. However, *McCalla*, which is out of circuit, is not binding on this Court. More importantly, under § 3582(c), courts, "may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term

of imprisonment)." 18 U.S.C. § 3582(c)(1)(A). Furthermore, federal law vests the BOP with "plenary power to designate where inmates serve their sentences." *See United States v.* Woody, ---F.Supp.3d---, 2020 WL 2989206, at *2 (S.D.N.Y. May 29, 2020) (citing 18 U.S.C. § 3621(b)); *see also United States v. Konny*, ---F.Supp.3d---, 2020 WL 2836783, at *2 (S.D.N.Y. May 30, 2020) ("the authority to place a prisoner in home confinement rests with the BOP under 18 U.S.C. § 3624(c)(2), and the discretion to make such an order lies solely with the Attorney general".). Accordingly, DiBiase's request to convert his sentence into a term of home confinement must be denied because it is not a request that can be granted by a court pursuant to § 3582(c).

### B. Application of § 3582(c) to DiBiase's Case

The Government does not dispute that DiBiase's medical condition puts him at greater risk of developing severe complications if infected with COVID-19, or that he has demonstrated "extraordinary and compelling" reasons for relief. Rather, it contends that a reduced sentence pursuant to § 3582 is unwarranted in spite of these circumstances. The Court agrees.

In considering whether the grant relief pursuant to § 3582(c), courts are instructed to consider "the factors set forth in section 3553(a) to the extent that they are applicable." 18 U.S.C. § 3582(c)(1)(A). Here, the seriousness of the offense is self-evident. DiBiase and his co-conspirators engaged in 27 home invasions, including five gun-point robberies. It is clear from the victim impact statements quoted above that the victims are still struggling to cope with their resulting trauma, and some of them even decided to move from their homes, where they no longer felt safe, in order to avoid reliving the memories of the horrific crime. *See supra* note 2. As this Court noted, it is "the stuff of horror films." Moreover, the Court reiterates its conclusion that his role as the getaway driver entitles him to no leniency. DiBiase, who was in his fifties

with prior convictions and enough experience to know right and wrong, nevertheless chose to be a critical and knowing participant in all 27 home invasions that involved millions of dollars in stolen goods.[5]  To release him now, nearly two and a half years before his scheduled release date, would fail both to provide just punishment reflecting the "seriousness of the offense" and to afford "adequate deterrence."  18 U.S.C. § 3553(a)(2).  Moreover, the Court gave full consideration to DiBiase's medical condition at the time of his resentencing, and still found that 144 months of imprisonment was merited.

To be sure, these are extraordinary times.  But as this Court observed in the context of a separate application, "just because there is a pandemic does not mean that the jailhouse doors ought to be thrown open."  *United States v. Nunez*, No. 20 Cr. 239 (ER) (S.D.N.Y. Apr. 10, 2020) (Ramos, J.).  DiBiase received a sentence for serious and dangerous crimes, and he has failed to show that deterrence is no longer needed.  Accordingly, his motion for compassionate release is denied.  *See United States v. Conley*, No. 19 Cr. 131 (PAE) (S.D.N.Y. Mar. 31, 2020) (Engelmayer, J.) (denying pretrial bail for inmate on high-risk list with asthma, partial lung removal, diabetes, high blood pressure, and hypertension because medical risks were outweighed by serious risk of danger to community).

---

[5] DiBiase's reliance on *United States v. Adeyemi*, ---F.Supp.3d---, 2020 WL 3642478 (E.D. Pa. July 6, 2020) is misplaced.  In *Adeyemi*, the Court granted compassionate release to an inmate who acted as the getaway driver for two robberies of fast food restaurants.  However, unlike DiBiase who was in his fifties with prior convictions and enough experiences to know right and wrong, the defendant in *Adeyemi* was a 19-year-old pre-med college student with no criminal history.  *Adeyemi*, 2020 WL 3642478, at *2.  Moreover, Mr. Adeyemi served as the getaway driver for two robberies that involved $860 and took place within two hours of the same night, *see id*., whereas DiBiase participated in an extensive scheme of 27 home invasions that involved $2.5 million in stolen goods and lasted more than a year.

## IV. CONCLUSION

For the aforementioned reasons, DiBiase's motion for compassionate release is DENIED. The Clerk of the Court is respectfully directed to terminate the motion, Doc. 217, and the accompanying letter motions, Docs. 224, 226, and 229.

It is SO ORDERED.

Dated:   September 14, 2020
         New York, New York

_____
Edgardo Ramos, U.S.D.J.